PER CURIAM: *
David Brian Mann was charged with being a felon in possession of a firearm. After the district court found Mann incompetent to stand trial, the government moved to forcibly medicate him to restore his competency for trial. The district court granted the government’s motion, and Mann appeals. For the reasons set forth below, we AFFIRM.
I. FACTUAL AND PROCEDURAL BACKGROUND
On April 15, 2010, David Mann was charged in a criminal complaint with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Mann had come to the attention of law enforcement after sending facsimiles to various federal courts that, although largely unintelligible, were deemed potentially threatening because they appeared to discuss placing something “up in smoke” and killing one or more individuals. During the course of investigating these facsimiles, law enforcement officers learned that Mann was a convicted felon, and also discovered a loaded firearm and over three-hundred rounds of ammunition in his vehicle. After a joint preliminary and detention hearing following his arrest, a magistrate judge ordered Mann detained pending trial.
On May 3, 2010, Mann filed an unopposed motion for a psychiatric or psychological examination and for a hearing to determine his competency to proceed to trial. Among other things, the motion suggested that reasonable cause existed to believe that Mann was incompetent to stand trial because (1) the evidence at the detention hearing included “largely unintelligible” facsimiles; (2) the magistrate judge’s order following the detention hearing stated that “Mann has a history of mental illness that according to his brother includes a diagnosis of bi-polar with a schizophrenic disorder”; and (3) in a prior proceeding in Texas state court, a jury had concluded that Mann was incompetent to proceed to trial, and he subsequently had been committed to a state mental facility. In light of this motion, a magistrate judge ordered that Mann undergo a psychiatric or psychological examination pursuant to 18 U.S.C. § 4241(b) to assess his competency to stand trial.
Mann eventually was indicted for violating 18 U.S.C. § 922(g)(1) and the court entered a not guilty plea on his behalf. At a competency hearing held in August 2010, the district court determined — based largely on the psychological evaluation ordered by the magistrate judge and conducted by the Bureau of Prisons (“BOP”) in Fort Worth, Texas — that Mann was incompetent to proceed to trial. Consequently, pursuant to 18 U.S.C. § 4241(d), the court entered an order directing that Mann be transferred to a medical facility *484 for a period of 120 days “for the purposes of treating and restoring [his] competence.” In accordance with relevant law, the order did not then address whether Mann could be forcibly medicated.
On January 6, 2011, the chief psychiatrist at the Federal Medical Center in Butner, North Carolina (“FMC Butner”) held a hearing pursuant to Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)[1] (“Harper hearing”), to determine whether Mann should be involuntarily medicated on the basis that he was a danger to himself and others.[2] Pursuant to applicable BOP regulations, Mann received written notice of the hearing, was present and advised of his rights, and had the aid of a staff representative at the hearing. A report prepared after Mann’s Harper hearing (“Harper Report”) concluded that Mann suffered from a form of schizophrenia, but that he did not meet the criteria for involuntary treatment pursuant to Harper because he was not a danger to himself or others, and his mental illness had not rendered him gravely disabled or unable to care for his physical needs. Mann’s Harper Report did not contain an opinion or reference as to whether he could or should be involuntarily medicated to restore his competency to proceed to trial.
On January 27, 2011, Mann’s treating psychologist and psychiatrist at FMC Butner issued an evaluation assessing Mann’s mental state and the potential use of forced medication to restore his competency to stand trial (“Butner Evaluation”). No hearing was conducted specifically in connection with the evaluation, though the report recounted the information that had been considered, including Mann’s review conducted by the BOP in Fort Worth; Mann’s Harper Report; other BOP medical and psychological files and reports; statements by Mann’s brother that Mann previously had been committed after an arrest, and had been restored to competency following treatment; and letters Mann had written. The Butner Evaluation concluded that although Mann was not then competent to proceed to trial, there was a substantial probability that his competency could be restored via treatment with antipsychotic medication.
Accordingly, the Butner Evaluation specifically contemplated the possibility of involuntary medication under the requirements of Sell v. United States, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).[3] In particular, the evaluation discussed in detail three medications that could be administered to Mann to render him competent for trial, the side effects of *485 those medications, and other pertinent information. Finally, the Butner Evaluation requested that the district court make a judicial determination under Sell as to the propriety of involuntarily medicating Mann to restore his competency for trial.
After the district court conducted a status conference to discuss the Butner Evaluation, the government requested in March 2011 that medication be forcibly administered to Mann to render him competent to stand trial. Mann opposed the request and filed a motion for release without bond. In his motion opposing involuntary medication, Mann maintained that the government had not satisfied Sell’s requirement that it demonstrate an important interest in forcibly medicating him. See 539 U.S. at 180,123 S.Ct. 2174.
On May 5, 2011, the court held a hearing on the parties’ motions. There, the government argued that it had an important interest at stake because, among other things, Mann had “exhibited behavior [that] has escalated potentially in dangerousness”; there were no assurances that Mann or the community would be safe if he were not confined pending trial; and the government had a “serious interest” in bringing the case to trial because the full range of punishment for Mann’s crime could yield up to a ten-year sentence. Notwithstanding these arguments, however, on May 10, 2011, the court denied the government’s request to forcibly medicate Mann and ordered that he be released from custody without bond.
Over three months later, on August 26, 2011, the United States Marshal Service issued an alert to law enforcement officials after Mann told a mechanic that he was going to the federal courthouse in Houston to kill everyone. The government filed a motion on August 29, 2011, requesting that the district court reconsider its order denying Mann’s forcible medication. The district court granted the motion on August 31, 2011, and ordered Mann returned to custody pending further proceedings.
The district court then held a hearing on September 12, 2011, to determine whether Mann should be detained further and whether, under Sell, he should be medicated involuntarily to render him competent to stand trial. At that hearing, a United States marshal testified about her investigation into Mann’s August 2011 threats. Specifically, she relayed that Mann had told the mechanic that he was angry “at the Federal Government” because it “had killed over 200 people, that he wasn’t going to wait to be killed, that he was going to the federal building to kill everyone ... in downtown Houston, and that he had weapons with him.” The marshal also stated that Mann had only been located and apprehended after law enforcement officers enlisted the assistance of Mann’s brother.
After the marshal testified, the district court granted the government’s motion and ordered that Mann be forcibly medicated “so that he might be brought to a point of mental capacity to assist his attorney in representing him and in preparing for his defense.” In a subsequent written order, the court explained that the government had satisfied Sell’s requirements and, in particular, that the Butner Evaluation and arguments of counsel demonstrated “that important government interests are at stake in retaining Mann in a medical facility in order to restore Mann to competency so that he may face the charges alleged in the indictment.” The court consequently ordered that Mann be committed for four months for treatment in accordance with the recommendation in the Butner Evaluation, and authorized the government to forcibly administer antipsychotic medication to Mann as necessary.
Mann timely filed notice of appeal on September 26, 2011, arguing that the dis *486 trict court erred in ordering that he be forcibly medicated. On September 27, 2011, the district court granted Mann’s unopposed motion to stay the involuntary administration of medication pending disposition of this appeal.
II. JURISDICTION AND STANDARD OF REVIEW
Because involuntary medication orders conclusively decide a disputed question and resolve an important issue, this court has jurisdiction to consider this appeal under the collateral order doctrine. See Sell, 539 U.S. at 175-77, 123 S.Ct. 2174; United States v. White, 431 F.3d 431, 432-33 (5th Cir.2005). In forcible medication cases, this court ordinarily reviews the district court’s findings of fact for clear error and its conclusions of law de novo. White, 431 F.3d at 433. However, when, as here, a party “fails to preserve an error by specific objection in the trial court, an appellate court reviews the district court’s legal conclusions for plain error.” United States v. Vargas-Soto, 700 F.3d 180, 182 (5th Cir.2012).
Under plain-error review, the party seeking review “must establish: (1) an error; (2) that is clear and obvious; and (3) that affected his substantial rights.” United States v. Hernandez-Martinez, 485 F.3d 270, 273 (5th Cir.2007). “If these conditions are met, this court can exercise its discretion to notice the forfeited error only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.” Id. (internal quotation marks and citation omitted). Even under plain-error review, we consider de novo whether an “error” has been committed. United States v. Anderson, 559 F.3d 348, 354 (5th Cir.2009).
III. ANALYSIS
On appeal, Mann raises two arguments. First, he submits that the district court committed plain error by ordering that he be forcibly medicated for trial competency purposes without requiring the government to exhaust certain administrative remedies. Second, Mann maintains that he should have received a second Harper hearing after his May 2011 release, and that the court’s failure to require such a hearing constituted plain error. We will consider these arguments in detail after briefly discussing the legal framework surrounding forcible medication orders.
A. Applicable Law
In Harper, the Supreme Court explained that inmates possess “a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment.” 494 U.S. at 221-22, 110 S.Ct. 1028. Nevertheless, the Court also recognized that “[t]he extent of a prisoner’s right under the Clause to avoid unwanted administration of antipsychotic drugs must be defined in the context of the inmate’s confinement.” Id. at 222, 110 S.Ct. 1028. The Court acknowledged, in other words, that not only does the government have an “interest in combating the danger posed by a person to both himself and others ... in a prison environment,” but it also has an obligation to combat such danger. Id. at 225, 110 S.Ct. 1028. Accordingly, Harper held that the Constitution permits the government “to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate’s medical interest.” Id. at 227, 110 S.Ct. 1028.
More recently, the Court considered in Sell whether the Constitution permits the government to forcibly medicate a defendant for the purpose of rendering him *487 competent to stand trial. 539 U.S. at 169, 123 S.Ct. 2174. The Court ultimately concluded that the government may forcibly administer medication “solely for trial competence purposes,” but only “in certain instances” that “may be rare.” Id. at 180, 123 S.Ct. 2174. Specifically, Sell held that before a court properly may order a defendant’s forcible medication, it must find that: (1) “important governmental interests are at stake”; (2) “involuntary medication will significantly further those ... interests” in that the medication is “substantially likely to render the defendant competent to stand trial,” and is “substantially unlikely to have side effects that will interfere with the defendant’s ability to assist counsel in conducting a trial defense”; (3) “involuntary medication is necessary to further those interest.... [in] that any alternative, less intrusive treatments are unlikely to achieve substantially the same results”; and (4) “administration of the drugs is medically appropriate, i.e., in the patient’s best medical interest in light of his medical condition.” Id. at 180-81, 123 S.Ct. 2174.
Although Harper and Sell primarily focused on the substantive aspects of a defendant’s due process right, a defendant also may be entitled to certain procedural protections in connection with the government’s efforts to involuntarily medicate him. BOP regulations in effect until August 12, 2011 (“1992 regulations”), for instance, outlined the “administrative due process procedures” available to inmates the government sought to forcibly medicate. 28 C.F.R. § 549.43 (1992).[4]
Under the 1992 regulations, before the government could forcibly medicate an inmate on either dangerousness or trial competency grounds, it was required to provide him with notice of an impending hearing and “the reasons for the medication proposal.” Id. § 549.43(a)(1), (5). It then was required to hold a hearing at which the inmate had “the right to appear, to present evidence, to have a staff representative, to request witnesses, and to request that witnesses be questioned by the staff representative or by the person conducting the hearing.” Id. § 549.43(a)(2). The regulations mandated that the hearing be conducted by a neutral psychiatrist who was not then “involved in the diagnosis or treatment of the inmate,” id. § 549.43(a)(3), but who was charged during the hearing with determining whether medication was necessary on the basis for which it was sought, id. § 549.43(a)(5). The inmate’s treating clinician was required to attend the hearing and “present clinical data and background information relative to the need for medication.” Id. § 549.43(a)(4). At the conclusion of the hearing, the presiding psychiatrist was directed to prepare a written report outlining his or her decision, and to provide that report to the inmate, who then had the right to appeal to an institutional administrator. Id. § 549.43(a)(5), (6). Although there was no statutory or regulatory provision mandating that the government exhaust these procedures prior to seeking a forcible medication order in federal court, we recognized in White that the jurisprudential doctrine of exhaustion applies to these cases. 431 F.3d at 434.
Importantly, effective August 12, 2011, the 1992 regulations were “clarified and updated to reflect current caselaw” — most pertinently, Sell (the “2011 regulations”). *488 Psychiatric Evaluation and Treatment, 76 Fed.Reg. 40229, 40229 (July 8, 2011); see also 28 C.F.R. § 549.46 (2011). The amendment specifically codified the directive emanating from Sell that “[o]nly a Federal court of competent jurisdiction may order the involuntary administration of psychiatric medication for the sole purpose of restoring a person’s competency to stand trial.” Id.; see also Sell, 539 U.S. at 180-83, 123 S.Ct. 2174. Accordingly, under the 2011 regulations, an administrative hearing and its attendant procedures are no longer required where a court orders involuntary medication solely to render an inmate competent to proceed to trial. 28 C.F.R. § 549.46(b)(2). The procedural safeguards outlined above remain in place for defendants the government seeks to forcibly medicate on dangerousness grounds. 28 C.F.R. § 549.46(a).
B. Discussion
Mann advances two arguments to support his contention that the district court committed plain error by ordering that he be forcibly medicated to stand trial. First, he submits that because many of the events concerning this case took place before the effective date of the 2011 regulations, the 1992 regulations apply. Accordingly, Mann maintains that he was deprived of an administrative hearing, available under the 1992 regulations, concerning the propriety of forcibly medicating him for trial competency purposes. Second, Mann argues that regardless of which regulations apply, he was erroneously deprived of a second Harper hearing after his release in May 2011, which he believes should have been conducted before the court ruled on the government’s August 2011 motion to reconsider. These assertions will be discussed in turn.
1. The Applicable Regulations
“The first step in plain-error review is to determine whether there was error.” United States v. Rodriguez-Escareno, 700 F.3d 751, 753 (5th Cir.2012). “[T]he burden of establishing entitlement to relief for plain error is on the defendant claiming it.” United States v. Dominguez Benitez, 542 U.S. 74, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). Here, Mann attempts to satisfy this burden by asserting that the 1992 regulations apply to his case, and that he therefore was erroneously denied an administrative hearing — conducted by a neutral clinician — -concerning whether he should be forcibly medicated to stand trial. See 28 C.F.R. § 549.43(a)(1), (5) (1992). In support of this argument, Mann highlights that the 1992 regulations were in effect when he was charged in April 2010 and when the government first moved to forcibly medicate him in March 2011. He further contends that although the government filed its motion to reconsider after the effective date of the 2011 regulations, the motion referenced the government’s arguments made in earlier filings and, in any event, his Harper Report and Butner Evaluation were prepared prior to August 2011.
Mann relies on United States v. Gutierrez to advance his argument. 443 Fed. Appx. 898 (5th Cir.2011) (unpublished). In Gutierrez, a defendant (“Gutierrez”) who had threatened to harm or kill several public officials was deemed incompetent to stand trial. 443 Fed.Appx. at 899. As here, the government had provided Gutierrez a Harper hearing to determine whether medication should be involuntarily administered to him on dangerousness grounds. Id. at 899-900. Gutierrez’s Harper report concluded that forcible medication for dangerousness was not warranted, but it did not address whether it was justified for trial competency pursuant to Sell. Id. As with Mann, the government subsequently moved for a determination *489 from the district court that Gutierrez could be forcibly medicated under Sell solely for trial competency purposes. Id. at 900. The district court granted the motion, based largely on a report and testimony provided by Gutierrez’s treating clinicians at FMC Butner. Id.
Gutierrez appealed, arguing that he was entitled to an administrative hearing in connection with FMC Butner’s trial competency determination. Id. at 900-02. A panel of this court agreed, noting that although the 2011 regulations had taken effect after Gutierrez appealed, the 1992 regulations were “in place at the time the government sought to medicate” him. Id. at 901. The panel further held that the 1992 regulations applied on remand, because to hold otherwise would result in an impermissible retroactive application of the new regulations. Id. at 908.
In reaching these conclusions, the panel explained that deciding whether “a particular rule operates ‘retroactively’ ” involves “a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.” Id. at 905 (quoting Landgraf v. USI Film, Prods., 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Relying on Landgraf, Gutierrez emphasized that retroactivity analysis centers on “whether the new provision attaches new legal consequences to events completed before its enactment.” Id. (emphasis added) (quoting Landgraf, 511 U.S. at 270, 114 S.Ct. 1483). The panel further highlighted that, in considering these issues, it was required to “look to the government’s request that Gutierrez be forcibly medicated,” as that was “ ‘the relevant conduct regulated by the [regulations]’ and completed before the adoption of the regulations.” Id. (alteration in original) (quoting Republic of Austria v. Altmann, 541 U.S. 677, 697-98, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004)).
Applying these principles to the facts before it, the Gutierrez panel stressed that the 2011 regulations — though proposed “at the time the BOP sought to medicate Gutierrez” — had not been adopted until after he appealed the district court’s forcible medication order. Id. at 903; see also id. at 905 (noting that the 2011 regulations became effective “after the date [the government] sought to medicate Gutierrez”); id. at 908 (stating that the 1992 regulations “were controlling at the time the government sought to medicate Gutierrez”). Because the government’s request to forcibly medicate Gutierrez had been “completed before the adoption of the regulations,” the panel concluded that Gutierrez had “a settled expectation that the old regulations] would apply.” Id. at 905, 906 (emphasis added). Accordingly, it vacated the district court’s forcible medication order, holding that “[t]he government failed to exhaust the administrative processes outlined in the 1992 regulations.” Id. at 903-04, 908.
Mann’s reliance on Gutierrez, however, is misplaced. As is true of this case, the Gutierrez panel expressly recognized that its “holding [was] narrowly limited to the facts and procedural posture presented [there].” Id. at 908. Ignoring this admonition, Mann neglects the meaningful distinctions between the circumstances of his case and those presented in Gutierrez.
As mentioned, Gutierrez focused extensively on the fact that the government’s request to forcibly medicate Gutierrez was “completed” while the 1992 regulations were still in effect. Id. at 905. Such was not the case here. To be sure, the government first sought to forcibly medicate Mann in March 2011, when the 1992 regulations were in place. Nevertheless, the events precipitating its August 2011 mo *490 tion all occurred after the effective date of the 2011 regulations. In contrast to the situation in Gutierrez, here, the 2011 regulations were in effect: (1) on August 26, 2011, when Mann told a mechanic that he was going to the federal courthouse to kill everyone; (2) on August 29, 2011, when the government filed a motion seeking authorization to forcibly medicate Mann; (3) on September 12, 2011, when the district court held a hearing and granted the government’s motion after receiving evidence concerning Mann’s August 2011 threats; and (4) on September 20, 2011, when the court issued its written order authorizing Mann’s commitment and forcible medication.
This recitation reveals that the government’s initial request for authorization to forcibly medicate Mann was denied by the district court, Mann was released from custody, and things were left there. The government’s current request for authorization to forcibly medicate Mann was neither initiated nor, more importantly, completed — Gutierrez and Altmann instruct that completion is “the relevant conduct regulated by the regulations” — until after the new regulations became effective, when the government filed its August 2011 motion. Id. (alteration and citation omitted). Thus, in contrast to the defendant in Gutierrez, when the district court here issued its forcible medication order, Mann could not have had a reasonable expectation that the 1992 regulations would apply.
Put simply, because the events relevant to the district court’s order were not completed before the 2011 regulations took effect, the government was not constrained by the procedural requirements contained in the 1992 regulations. Rather, Mann’s case was controlled by the 2011 regulations, which eliminated the requirement that the government conduct an administrative hearing before seeking authorization to forcibly medicate a defendant for trial competency purposes. 28 C.F.R. § 549.46(b)(2) (2011). Accordingly, we hold that the district court committed no error in entering its forcible medication order without first requiring the government to conduct such a hearing.
Moreover, although we find no error, even were we to assume arguendo that the district court erred, Mann still could not carry his burden of demonstrating revers- ■ ible error. To prevail under plain-error review, a defendant must establish not only that the district court erred, but also that the error committed was “plain.” A “plain” error is one that is “clear or obvious, rather than subject to reasonable dispute.” Puckett v. United States, 556 Ü.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). In other words, the error must be so “obvious,” “clear,” or “readily apparent” that the court was “derelict in countenancing [it], even absent the defendant’s timely assistance in detecting [it].” United States v. Miller, 406 F.3d 323, 330 (5th Cir.2005) (alterations in original) (quoting United States v. Dupre, 117 F.3d 810, 817 (5th Cir.1997)). Given this high bar, we previously have held that “even where an argument merely requires extending existing precedent, the district court’s failure to do so cannot be plain error.” Jimenez v. Wood County, Tex., 660 F.3d 841, 847 (5th Cir.2011).
Thus, as applied here, to satisfy the second prong of plain-error review, Mann must demonstrate not only that the 1992 regulations were controlling throughout his case, but also that those regulations obviously were controlling. In attempting to satisfy this burden, Mann again relies on Gutierrez. Gutierrez, however, concerned circumstances in which the 1992 regulations were the only provisions in effect during the course of the defendant’s district court proceedings. 443 Fed.Appx. *491 at 905. For that reason, the court’s disposition rested heavily on the fact that the 2011 regulations were not adopted until after Gutierrez appealed. See id. (“An agency cannot obtain a de facto rule change by complying with a proposed rule....”). Gutierrez therefore did not address the situation presented here, where the 2011 regulations were firmly in place when the government sought the forcible medication order at issue here, and when the court issued that order. See United States v. Potts, 644 F.3d 233, 236-37 (5th Cir.2011) (explaining that the defendant could not satisfy plain-error review “because the error he claim[ed] was not clear under existing Fifth Circuit law”).[5] Further, although retroactivity analysis certainly is nothing new, as the Supreme Court has explained, “[a]ny test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity.” Landgraf 511 U.S. at 270, 114 S.Ct. 1483.
Accordingly, we hold both that the district court committed no error in proceeding under the 2011 regulations, and that Mann has not demonstrated that the “error” he alleges was so obvious, clear, or readily apparent that the district court was derelict in countenancing it.
2. The Necessity of a Second Harper Hearing
Relying on Sell, Mann also argues that under either the 1992 or 2011 regulations, the district court plainly erred by depriving him of a second Harper hearing, which he submits should have been conducted after he was released in May 2011, but before the court ruled on the government’s August 2011 motion to reconsider. As we will explain, a second Harper hearing was not required in the instant circumstances.
In Sell, the Supreme Court explained that a court need not employ the standards set forth in that case if forced medication is warranted for purposes other than rendering a defendant competent for trial, “such as the purposes set out in Harper related to the individual’s dangerousness, or purposes related to the individual’s own interests where refusal to take drugs puts his health gravely at risk.” Sell, 539 U.S. at 181-82, 123 S.Ct. 2174. Indeed, the Court explained that “[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds before turning to the trial competence question.” Id. at 182, 123 S.Ct. 2174. In particular, the Court first noted that “the inquiry into whether medication is permissible ... to render an individual nondangerous is usually more objective and manageable than the inquiry into whether medication is permissible to render a defendant competent.” Id. (internal quotation marks and citation omitted). Second, Sell observed that “courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, Harper-type grounds.” Id. Finally, the Court explained that if medication is authorized “on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear.” Id. at 183. Thus, Sell concluded that “a court, asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial, should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other Harper- *492 type grounds; and, if not, why not.” Id. (emphasis added).
We applied these principles in White, 431 F.3d 431. There, the government “sought an order directly from the district court authorizing involuntary medication, first on the basis of dangerousness, and, in the alternative, on the basis of competence to stand trial.” Id. at 434. Although the government had not conducted a Harper hearing before seeking a forcible medication order, the district court nevertheless held that involuntary medication was warranted on both grounds advanced by the government. Id. at 432. We reversed, observing that the government’s request “made an end run around the regulatory scheme laid out in” the 1992 regulations. Id. at 432, 434; see also id. at 435 (“Nothing in Sell casts doubt on [the 1992 regulations’] applicability to the dangerousness inquiry.”). In light of Harper and Sell, we held that it “was error for the district court to make the initial determination to medicate [the defendant] involuntarily.” Id. at 434. We thus vacated the district court’s forcible medication order and instructed the court to order exhaustion of the administrative procedures set forth in the 1992 regulations. Id. at 435-36.
Mann submits that, together, Harper, Sell, and White stand for the proposition that he was entitled to a second Harper hearing after the district court released him in May 2011. Underlying this contention is Mann’s argument that “[i]t could not be more clear that even before, but especially after, the court denied the government’s motion to forcibly medicate [him] on May 5, 2011, the government was seeking to [do so] on grounds of dangerousness.” Mann contends that the government “harped on [his] dangerousness” by stating to the district court that Mann had “exhibited behavior which has escalated in dangerousness”; his actions were “indicative of somebody whose behavior ha[d] escalated towards potentially a more violent range”; and his “conduct ha[d] escalated [and] created a substantial threat of harm to himself and others.” Mann further asserts that the only new evidence the government presented in its August 2011 motion to reconsider was “evidence on dangerousness” — specifically, the threats Mann made concerning killing people at the federal courthouse in Houston. Citing White, Mann asserts that, given the government’s focus on his alleged dangerousness, the district court plainly erred by failing to require the government to conduct a second Harper hearing before authorizing his forcible medication for trial competency purposes.
a. Mann’s Harper Hearing
We emphasize at the outset that Mann’s arguments neglect that he received a Harper hearing in January 2011 — -just months before the court ultimately issued its forcible medication order. Indeed, the only cases Mann cites in which courts have remanded for Harper hearings are cases where no such hearings ever were conducted, and where district courts authorized forcible medication without explaining the absence of a Harper inquiry. See, e.g., White, 431 F.3d at 435; United States v. Morrison, 415 F.3d 1180, 1181-82 (10th Cir.2005). Mann points to no authority discussing the circumstances under which a second Harper hearing might be required, much less authority suggesting that there may even be such a requirement.[6]
*493 To the contrary, some courts have affirmed forcible medication orders where the government never conducted a Harper hearing. See, e.g., United States v. Hernandez-Vasquez, 513 F.3d 908, 914-15 (9th Cir.2008) (concluding that the district court “undertook the Sell inquiry without making findings” under Harper, “after the Government had made clear that it did not intend to seek involuntary medication on dangerousness grounds”); United States v. Valenzuela-Puentes, 479 F.3d 1220, 1224-25 (10th Cir.2007) (explaining that “there was no need for the district court to perform a Harper inquiry or make Harper findings” because there was no evidence that the defendant might be dangerous). This approach is not inconsistent with Sell’s directive that courts “asked to approve forced administration of drugs” to restore a defendant’s trial competency “should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on ... Harper-type grounds; and, if not, why not.” Sell, 539 U.S. at 183, 123 S.Ct. 2174 (emphases added). Where a Harper report indicates that a defendant is not dangerous, or where there is otherwise no evidence of his dangerousness, the reason for the government’s decision not to seek a forcible medication order on that basis would seem obvious.
Further, although Mann evidently believes that his January 2011 Harper Report was stale by the time the court issued its forcible medication order, the purposes underlying the Sell Court’s admonition that a court ordinarily should “determine whether forced administration of drugs can be justified on [Harper type] grounds before turning to the trial competence question” clearly were satisfied in this case. Sell, 539 U.S. at 182, 123 S.Ct. 2174. In particular, because Mann received a Harper hearing, a neutral clinician already had engaged in the more “objective and manageable” inquiry into whether medication was permissible to render him non-dangerous. See id. (citation omitted). Although the related report did not support forcibly medicating Mann for this purpose, “the findings underlying [that] decision [helped] to inform expert opinion and judicial decisionmaking in respect to [the] request to administer drugs for trial competence purposes.” Id. at 183, 123 S.Ct. 2174. In fact, the findings from Mann’s Harper Report were included in the Butner Evaluation, which the court specifically referenced in its order authorizing Mann’s forcible medication.
Simply put, Mann cites no authority to support his argument that a second Harper hearing generally is required in the instant circumstances, and we have found none.
b. Evidence of Mann’s Dangerousness
Mann also advances, however, the more specific argument that he was entitled to a second Harper hearing because the government improperly relied on evidence of his dangerousness in seeking to medicate him for trial competency purposes. We disagree.
As previously noted, the Butner Evaluation expressly contemplated the possibility of involuntarily medicating Mann pursuant to Sell. The evaluation provided a detailed recommendation as to the medications that could be administered to Mann to render him competent for trial, the side effects of those medications, and other related information. Thus, the only remaining question was whether “important governmen *494 tal interests [were] at stake” — an inquiry Sell left to the judiciary. Id. at 180, 123 S.Ct. 2174.
In connection with this inquiry, the district court considered evidence of Mann’s dangerousness. Mann complains that consideration of such evidence was improper, as he suggests its introduction is indicia of an improper governmental motive to medicate him on dangerousness grounds. The government responds that it consistently pursued in the district court an order authorizing it to forcibly medicate Mann solely for trial competency purposes. Moreover, the government argues that it only introduced evidence of Mann’s dangerousness to prove that important governmental interests were at stake.
The government asserts that its position is supported by United States v. Palmer, 507 F.3d 300 (5th Cir.2007). There, the defendant (“Palmer”) first was indicted after threatening to kill a federal court security officer. 507 F.3d at 301. A mental health evaluation subsequently conducted at FMC Butner revealed that Palmer suffered from a delusional disorder, but that he was not a danger to himself or others. Id. The indictment against Palmer eventually was dismissed, but nearly two years later, he was arrested after resisting arrest by United States marshals, who had discovered Palmer with a firearm on the Louisiana State University (“LSU”) campus. Id. at 302. In connection with this incident, Palmer was charged with firearms offenses and remanded to the custody of FMC Butner for an evaluation of his competency to stand trial. Id. In then-report, Palmer’s treating clinicians at FMC Butner recommended that he be forcibly medicated to restore his trial competency. Id. The district court so ordered, and Palmer appealed. Id. at 303.
In addressing the district court’s treatment of the Sell factors, Palmer noted that, in connection with the first factor, the “[Supreme] Court recognized that there is an important governmental interest in ensuring that individuals accused of serious crimes are brought to trial.” Id. (citing Sell, 539 U.S. at 180, 123 S.Ct. 2174). Palmer further explained that “[n]ot only have courts held that crimes authorizing punishments of over six months are ‘serious,’ they have also concluded that it is appropriate to consider the maximum penalty, rather than the sentencing guidelines range, in determining ‘seriousness’ in involuntary medication proceedings.” Id. at 304. Because the defendant “threatened the life of a federal officer and caused substantial disruption on and near the LSU campus,” the Palmer court expressed that “it is possible a court may find it appropriate, if he is convicted, to upwardly depart from the guidelines recommended sentencing range.” Id. (emphasis added). The court therefore held that the district court had not erred in finding that an important governmental interest was at stake.
We agree with the government that, under Palmer, a court may consider the maximum penalty a defendant may receive in assessing the “seriousness” of his crime. Id. Thus, contrary to Mann’s argument, it was proper for the government to introduce evidence touching on Mann’s dangerousness in order to prove that it had an important interest in forcibly medicating him for trial competency purposes.[7] Other courts have reached the same conclusion. See, e.g., United States v. Gomes, 387 F.3d 157, 160 (2d Cir.2004) (explaining that “[b]oth the seriousness of the crime and [the defendant’s] perceived dangerousness *495 to society [were] evident from the substantial sentence [the defendant faced] if convicted,” leading to the conclusion that the government had an important interest in bringing him to trial (citation omitted)); accord United States v. Green, 532 F.3d 538, 546-49 (6th Cir.2008); United States v. Evans, 404 F.3d 227, 236-38 (4th Cir. 2005).
In this case, the government consistently pursued an order authorizing it to forcibly medicate Mann solely for trial competency purposes. More importantly, it clearly was on this basis that the district court issued its order.[8] We therefore find no error, plain or otherwise, in connection with Mann’s assertion that the government improperly relied on evidence of his dangerousness in seeking his forcible medication to stand trial.
In summary, we find no authority or rationale to accept Mann’s contention that he was entitled to a second Harper hearing. We therefore hold that the district court did not plainly err in authorizing Mann’s forcible medication without requiring the government to conduct another such hearing.
IV. CONCLUSION
For the foregoing reasons, we AFFIRM the district court’s order.

 Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

. As discussed more thoroughly infra, Harper held that the Due Process Clause permits the government to forcibly medicate a prison inmate with a serious mental illness "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.” 494 U.S. at 227, 110 S.Ct. 1028.

. This hearing took place more than 120 days after the court’s August 2010 order. On October 29, 2010, officials at FMC Butner notified the court that Mann had not been transferred to its custody until October 5, 2010. Facility personnel therefore requested that the evaluation period ordered in August 2010 extend through February 1, 2011. Mann opposed the request, contending that the BOP was responsible for the delay and that the court's order, as well as 18 U.S.C. § 4241(d), authorized a maximum of four months to determine whether there was a substantial probability that Mann would become competent. The record does not reflect whether the district court formally ruled on these matters, though Mann does not raise them as grounds for his appeal.

. As explained more fully infra, Sell held that the Constitution "permit[s] involuntary administration of drugs solely for trial competence purposes in certain instances.” 539 U.S. at 180, 123 S.Ct. 2174.

. The regulations contained in 28 C.F.R. § 549.43 until August 12, 2011, were first made effective on November 12, 1992. These regulations will be referred to, for convenience, as the "1992 regulations.” As further explained infra, the 1992 regulations were amended in 2011 and moved to 28 C.F.R. § 549.46. The amended regulations will be referred to as the "2011 regulations.”

. We note also that no other circuit appears to have addressed the precise question presented here.

. We note, however, that courts occasionally have remanded where there was some question whether an inmate’s first Harper hearing was conducted in compliance with BOP regulations. See, e.g., United States v. Morgan, 193 F.3d 252, 267-68 (4th Cir.1999); United *493 States v. Humphreys, 148 F.Supp.2d 949, 953 (D.S.D.2001); United States v. McAllister, 969 F.Supp. 1200, 1210 (D.Minn.1997). Here, however, Mann has not alleged that the Harper hearing he received was in any way procedurally defective.

. The government notes that like the defendant in Palmer, Mann faces a maximum sentence of ten years and, with his threats, has created a substantial risk of harm to others.

. The district court's order explained that the court was “required to consider the involuntary application of medical treatment (anti-psychotic medication) for Mann under the terms outlined” in Sell. It then proceeded to discuss Sell and made findings in connection with each of the Sell factors. Mann has not challenged those findings.